Good morning. We'll call our first case of the day, Chavarria-Calix v. Attorney General. I need a phone book here. Good morning, Your Honors. May it please the Court, my name is Adam Pessin. I'm an attorney here at Philadelphia at Fine, Kaplan & Black, appearing as counsel pro bono publico on behalf of the petitioner, Jose Chavarria-Calix. I'm joined today by Ms. Ayodele Gonzalo, who's an attorney at HIAS Pennsylvania, who handled this case before the immigration judge and the BIA during petitioner's second appearances there after remand from this Court. If it please the Court, I'd like to reserve five minutes of rebuttal time. That's great. Thank you, Your Honors. As the Court is surely aware, as you wade through the many immigration cases that appear before the federal courts, there are often, perhaps, predominantly harsh results for many of the petitioners that appear here. And as I look through the cases, trying to identify a unifying theme, it seems obvious to me that the poll star here is, what is congressional intent? What did Congress intend to transpire? Who did they intend to become a citizen? And how did they intend for that to occur? Can I ask you to start, though, by addressing the waiver argument that's been made? Why have you waived a request for non-pro-tunk relief? Yes, Your Honor. I don't think there really is any doubt here that Mr. Shavari Akalex, for eight years now in this litigation, has maintained that he is, in fact, a United States citizen and has requested equitable relief at every turn, in every pleading, in every petition for appeal that he's filed. Does it matter how you frame it, though? If you frame it to the BIA and to the IJ in the context of saying, send this to USCIS so that they can terminate, and then you come and say, no, no, no, we didn't really mean that, or they misunderstood me. What I really said was, you just declare her a citizen for your federal interest. Are those not different enough to cause some kind of exhaustion issue? I don't believe so, Your Honor. Not under the existing precedent of this Court, which does not require perfection. It is required that the BIA and the IJ be on notice of the relief sought of the injury that has been alleged to have occurred. And here there's no question as to either of those pertinent facts. And I think even going beyond that to the specifics here, when you get down into the merits of should the proceedings have been stopped, could the judge have halted proceedings to allow non-protunct relief, that was an erroneous conclusion by the judge. So on its face... But wasn't it what was being asked for? It was amongst other relief as well being asked for. Let's just stop at the ask for there a second. Sure. I know what your client wants, but what are you really asking for? Well, Your Honor... Tell me what you're asking for and how you're going to get it. How we get there. Sure. I think this case falls within the relief contemplated in Cherokee, though there it was found unavailable given the statutory bar, and in the unpublished decision authored just a short while later also by Judge Sirica, Jacobo. And in those cases, Judge Sirica talked I think somewhat at length about the availability of non-protunct relief when it's appropriate and what it contemplates. And Judge Sirica invokes the Edwards decision from the Second Circuit, which contemplates and understands that federal courts... I understand how you're getting there. Sure. But I'm still troubled with what you're asking for. Sure. We would like the court to recognize the effective date of Raina Kalix's naturalization application as November 16, 1999. Who does that and how? I believe that this court can do that via its equitable powers. It is the sort of equitable remedy that courts fashion sitting in equity to remedy a wrong that has occurred that has not been... where the onus is not on the petitioner. There was nothing that petitioner could have done to change that. That's not disputed in the record. There are errors here that caused a significant benefit to be deprived from the petitioner. Well, you say they're errors. Define exactly what they are, the errors in terms of either statutory or regulatory framework. What do we hang our hat on in terms of saying, ah, this is what was done not according to law? I think there are a host of them. I think, to me, the defining one, the most troubling one, is the government's disregard for its own internal procedures that require them to expedite applications as an applicant who has a minor child approaches their 18th birthday. That's as it comes in. The unfortunate thing is this was filed when he was 15 and sat. Absolutely. So the procedures, you know, had it been filed when he was 17 and a half or 17, you might say, aha, they failed to do what the procedure said. But unfortunately, it was filed when he was 15. I mean, all the facts go the other way. I guess, Judge Rendell, I'm not quite sure I follow that. The regulations require that applications as an applicant approaches their 18th birthday be expedited. This application was pending all the way through this petitioner's 18th birthday. I assume that's true. Don't you have to have an affirmative misconduct to get where you're trying to go? And where's the affirmative misconduct? I think, Judge Jordan, there's two responses there. And the first is, no, I don't think affirmative misconduct is required for the court to fashion the non-protunct relief in the Cherokee and Jacobo decisions. There is an equitable remedy as long as there's not a statutory bar here. I thought your assertion as to this piece of it was that the government should be a stop from denying this. And if that's true, doesn't the law require affirmative misconduct on the part of the government? As to whether we're arguing a stop, well, yes, Your Honor, in addition to a request for non-protunct relief. And I think there are two separate avenues here. In fact, petitioners articulated three possible avenues for the court to get to the relief we seek, obviously. The first one is non-protunct relief, which is to fashion an equitable remedy to fix an error made that was beyond control of the petitioner. The second one, you're exactly right, Judge Jordan, the case law does require affirmative misconduct if this court were to enter an order of stopping the government from denying petitioners derivative citizenship. And the case law isn't clear as to what constitutes affirmative misconduct. Our argument is that this, the failure to follow internal procedures, the unreasonable delay, the repeated unreasonable delays, the repeated failure to implement procedures that were specifically designed to prevent the harm that was caused here rises to the level of affirmative misconduct. About the expedited procedures, I have looked at one that applies to Section 322, which has to do with adoption, I think. And this, we're under 321A. Right. So how does that apply? Is there an expedited procedure under 321A? According to the immigration judge and the BIA, there are. I have not been able to find the actual internal procedure. It's not in the congressional record. So you have an internal procedure that really doesn't apply to this section? Not according to the immigration judge. So if, I mean, this court would I think Well, not according to your research. You haven't found it under 321A. I'm relying on the factual findings of the immigration judge and the BIA, which I believe also bind this court. Well, that would be clearly erroneous. I mean, is it a factual finding or is it a question of law? There's a regulatory mechanism that applies. I don't know, Your Honor. I know that the immigration judge and the BIA, and was not disputed by the government below, that there were expedited procedures in place in the New York processing office where Ms. Kalix's application was pending. At the end of the day, how do you get around, and I'm not even sure I know how to say this case name, Pangilinan, or however, how do you say that? I've been saying Pangilinan, but I don't know if that's correct, Your Honor. No matter how many different ways you find to articulate it, at the end of the day, what you're asking for isn't it that this court grants citizenship? I don't think so. Not at all, Your Honor. And I think that's really the key issue that the court has to confront here. And in Pangilinan, Judge Scalia was very clear on what the issues were, and that's one of these cases arising from when Congress opened a small, they cracked a door open for Filipino soldiers that were joining U.S. forces in the 40s. And for political pressures, they first withdrew some of the availability of that, and then eventually closed the door. And then petitioners who otherwise would have qualified but didn't get through that door at the relevant time came and said, look, we deserve this. And everyone agreed that they deserved it. But Justice Scalia, I think rightly, says, you know what? Congress had the power to make this decision. The Constitution vests them with sole authority to make that decision, and there's no way a court can get around that. In contrast to here. Good. How does that template not fit directly on the circumstance here where we would say what happened here doesn't look fair, doesn't look right, looks like there was a foul-up, all wrong, but you know what? It's all Congress's responsibility, and we can't do what seems fair if the sole responsibility is in Congress. Well, Congress did what it was supposed to here. Congress said, we want this petitioner to become a citizen. Unfortunately, Congress said, you've got to have this done by your 18th birthday or you're out of luck. Well, Congress said, you automatically become a citizen if your mother naturalized. They didn't have any specific age dot provision like they have in the other section. No, they didn't. But they contemplated, and the legislative history is clear. They intended. There's no question and no court that I'm aware of has disputed that the intent here by Congress is that this petitioner becomes a citizen. And it's the error of the government that prevented it. It's not the law. There's no statutory bar here. The congressional intent was for him to naturalize automatically upon the naturalization of his mother and the condition precedent, the age limit here. The reason he didn't meet that was not his own fault, was not anything he could do. It was beyond his control. And it was actually the errors of the government that prevented it. All right. Well, you've reserved five minutes for rebuttal. Why don't we hear from you at that point? Thank you, Your Honor. Thank you. May it please the Court. Benit Jima for the respondent, the Attorney General. The basis for petitioner's claims of derivative citizenship, estoppel and nung portung, are equitable. Under the Supreme Court's precedent in Pendulina, this Court lacks the authority to grant equitable remedies in issues of naturalization. Petitioner's claim that Congress intended to have this particular alien naturalized is wrong. Congress provided no age-out provision when it amended the Child Citizenship Act in the same time frame that it amended the statute to provide for an age-out provision in issues of visas and adjustment of status. Did the government concede that this is an inequitable result, that an application that's made when a minor is 15 years old shouldn't take three years to process, leaving that individual without citizenship when it appears everybody in the family, his mother now deceased, his siblings, his children, their citizens, that there's something kind of off the rails about saying, yeah, it's true, we left you hanging for three years, and now we get to deport you? Well, the government would point out that after petitioner's mother naturalized, he had an opportunity to file for an application on his own for two years before he was convicted of a crime that made him removable. Leave that aside for a moment. I'm asking about, can the government concede that the result here is troubling? The board found, I cannot provide my own opinion, the board found that the circumstances here are unfortunate, but there is no legal remedy. And the courts don't have the authority to craft a legal, equitable remedy here, where the Supreme Court has explicitly said so, and Congress has exclusive constitutional authority over naturalization. The statute requires strict compliance. But isn't this a case, as distinguished from Pangellion, isn't this a case where derivative citizenship is citizenship by operational law? Isn't that the means by which you get derivative citizenship, by operation of law? That's right, but the means... You don't really have to do anything. If in fact the naturalization had taken place in November, instead of in March. But the same was the case in Pangellion. The citizenship there was also by operation of law, and the aliens there were allowed to bypass a number of requirements for others who... But it was different, it wasn't derivative, was it? It wasn't derivative, but they didn't have to show physical presence in the United States. Yeah. Which other... Okay, so you would argue that there's enough similarities. Absolutely. Those were World War II veterans that fought with the U.S. Army. I understand. I understand the equities. Okay, go ahead. Is there a companion provision like the Section 322 procedures that we've referred to? Is there a 321A? I was also unable to find one. I was only able to find the adopted children one. And here, Petitioner's mother did not inform the agency that her son was nearing 18. In 1997, things were not digitized. It's unclear that the agency even had the resources and ability to keep track of the age of all of the derivatives of every single application. So you're saying it might be different if she had sent a letter in when he was 17 1⁄2 saying, you know, he's going to turn 18 and that he's been pending for two years. And offered the agency an opportunity to trigger the expediting procedures, whatever they may have been. Your position, though, is even had she done that and they ignored it. There's still no equitable remedy for naturalization. Right. Unfortunately, that's the case. And that's what all the case law says. The Supreme Court has said that repeatedly. In Miranda, they said a mere delay is not enough. In Hebe, they said that even negligence is not enough. Other courts have found the same. And this court, in Abu Mehiya, also recognized that pendulonon prevents it from crafting an equitable remedy in cases of naturalization. So you seem to take the position that this isn't even a colorable argument. In fact, you've gone back and forth, the government has, on whether there's jurisdiction. Do you have jurisdiction or not? What's your position? The question of whether if someone were to argue that they are a citizen under the statute would be a legal question. But because your petitioner is asking purely for equitable remedies, which are not based on law, he admits that under the statute he's not a citizen. Here the government would argue there is no jurisdiction because of the criminal bar and his conviction for an aggravated felony. If there's a colorable legal argument, we have jurisdiction, right? That's right. Okay. For purely legal questions. Just the fact that this court remanded the case for examination by the BAA of the Child Status Protection Act. Doesn't that, in and of itself, indicate that there's enough of a colorable claim for us to have jurisdiction? I mean, it's not a minor point. Whether we've had jurisdiction or not is a pretty significant thing. Absolutely. But even in the remand, the court acknowledged that the Child Status Protection Act did not apply by its plain language. It asked the board to consider whether its reasoning could apply. And the board found that it can't because by its plain language the act does not apply. And Congress has left the age requirement without any exceptions, without any age-out provisions, when it amended the Child Citizenship Act in the same time frame. So whether the BAA is right or not is a legal question, right? Well, our position is that because it's by its plain language, it does not apply. That is not a colorable question. But if the court disagrees. Why isn't this case covered under the third exception in CHRUCA? I'm sorry, if you could specify the exception. Maybe I'm mispronouncing it. CHRUCA. Oh, in CHRUCA. CHRUCA. Why isn't the equitable remedy provided for in the third part of CHRUCA to correct an error in immigration proceedings? Because there was no error in immigration proceedings. Petitioners failed to identify any statute, any regulation that has been violated here. There is no affirmative misconduct. For equitable estoppel, you have to show affirmative misconduct. I understand different than affirmative misconduct. But to the extent that this certainly took longer than normal, and there was a deprivation of derivative citizenship by virtue of that, isn't it a valid argument that you can make that we've at least spoken in CHRUCA that this request should be considered? Even if the court were to disregard pangilinan, which says that the court cannot craft equitable remedies for naturalization, petitioners still failed to identify any statute, any regulation that the agency failed to comply with. The expediting procedures apply when an application is taken in. Petitioner was 15 at the time. The fact that there was an asbestos contamination that delayed proceedings cannot be faulted to the agency. Yeah, but then the asbestos contamination was further exacerbated by the hiring of illegal aliens to do the work. I mean, it was just one mistake by the government after another, not a simple contamination of office space. The issue before the court is whether mere delay is sufficient. And there is no mere delay is not sufficient for any sort of error by the agency. The agency has an inordinate number of applications and has to investigate every single application. If it were required to process these applications in any particular short span of time, it wouldn't be able to function. But at what point does delay become a violation of due process? I mean, surely there has to be some limit. The standard is whether proceedings are fundamentally fair. Here, where the agency complied with its regulations, it complied with its statute, the proceedings were fundamentally fair. Petitioner has received two rounds of hearings before the immigration judge and the board. He is asking the court to do something that the court lacks the power to do. Did you speak to the waiver argument that you asserted as to the non-protect belief about which I asked your opposing counsel? Yes, Your Honor. So he's said and, in fact, relies on, I think, our own precedent to note that as long as a petitioner makes some effort, however inadequate, to put people on notice of the argument, that's enough. What's wrong with—I mean, he's been asking for some kind of non-protective belief throughout why it's not enough to constitute notice to the government and therefore satisfy the exhaustion requirement. Because the board only responded to the question that petitioner presented to the board. And there, the petitioner asked the board to terminate proceedings so that USCIS could grant him derivative citizenship. The court here can only review what the board said. And where the board didn't have an opportunity to respond to the question that he's now presenting to this court— What was the general question, one that you folks on the immigration side understood all along, which was, hey, I want non-protective belief because I want to be a citizen. And you guys fouled it up, and it shouldn't fall on me that you fouled it up. That seems to be the argument made throughout. Is the government somehow surprised that that's the argument that's being made in front of us? Well, it matters how an individual presents a specific issue. Because the response that the board gave was to petitioner's specific question. Because that was the manner in which it was presented to the board. The board can't address every single angle of every single issue that arises before it. What's the meaning, then, of our precedent that says, some effort, no matter how inadequate, to present the issue? Isn't that a specific assertion by the court that we're going to ask the government to look at various angles? Sure, but the technical question here is a very different issue. What petitioner asked the board to do was terminate proceedings so that an agency that has the authority to grant citizenship could do so. The board never had the opportunity to address whether this court could declare petitioner a citizen. And that's the question he's now presenting here. And the board never had the opportunity to answer that. That is a very different technical question with different legal bases to support the response. Okay. Subject to any further questions that the court may have, the government will rest on the briefs. Thank you very much. Thank you. Mr. Pest? Thank you, Your Honors. I'd like to respond to primary points. First, going back to Pangilinan, and I think it really does matter what the statute is and really delving into what congressional intent is. And Justice Scalia is very clear and he is very explicit in delving into what Congress meant. When we're talking about those specific Filipino soldiers who joined forces with the United States in the 40s, Congress unequivocally closed that window of opportunity. It may have harsh results, but that is clearly what Congress intended. How do we divine intent that contradicts or runs counter to what the statute says? The statute says 18th birthday. How do we say, oh, well, surely they would say that has a little bit of flex depending upon when the application was filed and how long it takes? I mean, they said 18th birthday. How do we say the intent was something else? And what was the intent that someone who files at age 15, I mean, where do you draw that line? Sure, and I don't know that I have a response to that, Your Honor, but I'm not sure that that question has to be resolved in this case on these facts. Why not? Well, because Congress could have drafted a different statute, but they didn't. But what we do know is that they intended for minor children of naturalizing applicants to automatically derive it by operation of law. It's not automatic. They could have said whichever is later, you know, the 18th birthday or within, you know, however many years of the filing of the application or made it really automatic, but they didn't. They didn't say any application before your 18th birthday, no matter when it comes to fruition, you get derivatives. They didn't. Yes, Congress, this court, the courts could require that Congress draft statutes to accommodate or anticipate the incompetence of the government, and I don't believe that that's the standard. Boy, we'd be busy. Exactly, Your Honor. I don't think that can be reasonably the standard. There is a limit, as Judge Rendell asked before. I think there is a significant benefit that's been deprived. It's not just mere delay here. This is mistake after mistake, and for the first time in this entire eight years of proceedings, the government seemed to suggest that there wasn't a procedure requiring that the application be expedited. The IJ found that. The BIA found that. It's never been contested in this entire litigation. Again, that seems like a question of law, not a fact. But step away from that. Could you respond to Ms. Chima's point that your client had a window of opportunity after he aged out in which he could have sought naturalization on his own, but he didn't do that, and instead went out and convicted an aggravated felony. So it's not a great thing that he didn't get citizenship, but the result here is a consequence of decisions he made as an adult, too. With due respect to the government, I find that an extraordinarily distasteful argument that if you have an opportunity to remedy our mistake, then, hey, it's on you for not taking advantage of that. And that may have been the case, and believe me, we all wish that Mr. Chivari-Kalix had gone ahead and effectuated naturalization on his own, but he shouldn't have needed to. And stepping back another second here and looking at the actual equities, we have an immigrant who's a minor, second language is English, whose mother applies to naturalize, and everyone he knows has naturalized and become a U.S. citizen. Why should he, if I get arrested tomorrow and for some reason the government contests my citizenship, I could have at any point in the last 38 years gone ahead and sought a certificate of naturalization and attempted to naturalize. I could have done that and spared myself the future angst of having to fight the government, but I shouldn't have to. Well, that's not really a very applicable point, since nobody's questioning your citizenship, I don't think, Mr. Pessin, and he knows that he wasn't a citizen. That's his whole point, that he expected to become a citizen because of his mother's application. Now, when that didn't happen, and he knew it didn't happen, why is it wrong for the government to say, hey, if you're looking at the equities here, Third Circuit, why don't you consider the fact that he's a legal adult with two years to consider how to proceed, and instead of asking for citizenship, he commits a crime? Well, I think two responses, Judge Jordan. First, I'm not sure that he did know. I don't know that that's in the record, and I don't know if he actually knows that he didn't naturalize. Certainly once he's picked up by the government, he knows, and he has to make all of these arguments. I don't know if he actually knew he didn't naturalize. Well, but he would take constructive notice. He's on notice, basically, as a matter of law. I mean, his mother filed the application when he was 15, so all reasonable expectations are that he should have naturalized. I mean, that's what it seems clear that Congress intended. And I think I recognize I'm out of time. I want to point at least as a parting thought to a couple of cases that I think shed some light on how equitable remedies can operate in the context of derivative citizenship, and we have the, again, I'm not quite sure how to pronounce it, but Bagot decision by Judge Beckert. There's a series of these decisions from a number of circuits. There's the Fiero decision by Judge Boudin in the First Circuit. They reach different results, but the poll star there is what's the congressional intent? Can we recognize a state court non-proton decree that's fixing a problem that prevented derivative citizenship? And both courts are consistent in finding that, look, what we have to find out here is what did Congress mean? What did they want? And they both concluded that the relevant question is did Congress intend for this particular applicant who satisfied the conditions of the statute to naturalize? And the answer was yes.